**BURSOR & FISHER, P.A.**
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email:  sbogdanovich@bursor.com

*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTA CURRY, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>THE REALREAL, INC.,<br><br>　　　　　　　　　　Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Krista Curry ("Plaintiff") files this class action individually and on behalf of all others similarly situated (the "Class Members") against Defendant, The RealReal, Inc. ("The RealReal" or "Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of her undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action brought against The RealReal for allowing third-party companies to track customers' actions on its website, www.therealreal.com (the "Website"), even after customers *asked not to be tracked*.

2.      The RealReal operates an online clothing store that specializes in being a reseller and authenticator of luxury clothing and accessories.[1] Customers can shop for and buy items through the Website. However, Defendant implements tracking codes on its website that enabled Meta Platforms, Inc. ("Meta") and Pinterest, Inc. ("Pinterest") (collectively, the "Third Parties"), to collect and intercept customers' communications with Defendant.

3.      Defendant leads its consumers to believe it values their privacy by claiming to give them a "right to control" how their data is collected  and giving visitors the option to "Reject All" cookies that track their behavior on the Website.

///

///

///

///

///

///

///

///

///

///

---

[1] THE REALREAL, https://www.therealreal.com/about.

**Your Privacy**                    ✕

Welcome! We respect your privacy and your right to control how we collect, use, and share your personal data. Click here to manage your preferences. By continuing to browse the site you agree to the Terms of Service and the Cookie Policy.

**Accept All**

**Reject All**

Powered by ⬥ Ketch

*Figure 1*

4.      But this is a sham. When consumers like Plaintiff do, in fact,  click the "Reject All" button on this banner, Defendant continues to allow the third-parties to track them anyway.  In fact, immediately after a consumer clicks the Reject All button, Meta receives a "subscribedbuttonclick" event telling it the consumer has opted out of data sharing. And yet, the RealReal and Meta continue tracking their activities thereafter.

///

///

///

///

///

///

///

///

///

///

///



*Figure 2*

5.      Plaintiff brings this action individually and on behalf of all individuals who browsed for products on the Website, opted out of Defendant using tracking cookies, and whose electronic communications were nonetheless intercepted or recorded by the Third Parties.

6.      Furthermore, Plaintiff also brings this action on behalf of individuals who had their browsing information on the https://www.therealreal.com/ website (including the names of buttons clicked, the searches made, and the clothing items selected for purchase) disclosed to Meta and Pinterest in violation of various California state and federal privacy laws.

7.    The RealReal, Inc. owns and operates therealreal.com. Defendant installed various tracking technologies on the Website to permit Pinterest and Meta to intercept, in real time, which specific clothing items Website visitors were purchasing on the Website, along with whatever items they searched for. Worse still, both Pinterest and Meta also collect personal information—including first and last names, email addresses, IP addresses, and Facebook ID numbers—to determine *which* particular Website visitor was buying *which* particular clothing item, or making which particular search. Pinterest and Meta would read and review this information in real-time, and, within a matter of minutes, begin sending those very same Website users targeted advertisements for other clothing on other online platforms like Facebook, Instagram, or Pinterest.

8.    By installing these tracking technologies on its Website for the purpose for improving its own targeted advertising efforts, The RealReal aided, employed, agreed with, and/or conspired with Pinterest and Meta and other third-party vendors to intercept communications sent and received by Plaintiff and Class Members. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.  By failing to procure consent before enabling Meta and Pinterest's interception of these communications, and by disclosing such information to Meta and Pinterest, The RealReal violated the California Invasion of Privacy Act ("CIPA"), CAL. PENAL CODE §§ 631-632; Invasion of Privacy and Violation of the California Constitution, ART. 1, § 1; the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510 *et seq.*; and the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, et seq.

## THE PARTIES

*Plaintiff*

9.    Plaintiff Krista Curry is an adult citizen of the state of California and resides in Riverside County, California.

10.    Plaintiff Curry has visited Defendant's website dozens of times in the last few years. When she visited the Website for the first time, she was presented with a cookie banner and she clicked the "Reject All" button. She thereafter continued browsing and purchasing items thereafter. Most recently, on November 29, 2025, she purchased a Kate Spade New York Patent Leather Top

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    4

Handle Bag from the Website (Item Number WKA443082; Order Number R628736221). She also browsed the Website for the products on February 19, 2026, while located in California.  Although she did not purchase any products during this visit, to the best of her recollection, she browsed for handbags and vintage clothing during this February visit, asked to filter for the newest results, and typed Dior and Versace into the website's search bar. She discovered that the RealReal had been tracking her activities on the Website on February 23, 2026, when she reviewed her off Meta Technologies Activity Report and discovered that "49 interactions [from her most recent browsing session on the Website] were shared with" Meta.  This was on the same day she first spoke with her counsel about this case. A screenshot of her off Meta Technologies Activity Report, taken on the same day she discovered it, is reproduced below.

***Figure 3***



11.    This is by no means an exhaustive list of the interactions Plaintiff had on Defendant's website. As noted, she visited the Website on dozens of occasions and had her activities tracked by Meta and Pinterest each time.  Plaintiff is unable to plead more specific facts without the benefit of discovery. The off-Meta Technologies Activity Report only contains "a

summary of activity," such as the types of events collected (*i.e.* Page_View, Search, or Add to Cart events) but it "[w]on't show details like the [particular] item you've added to your shopping cart," the particular page a consumer visited, or a particular search that user entered.[2] Meta expressly states, "[w]e receive more details and activity than what appears" in the report[3], and, in Plaintiff counsel's experience, Meta only turns over more detailed information after being lawfully subpoenaed. Moreover, because Plaintiff only discovered her data was being tracked a single day before she had retained counsel on February 24, 2026, at the time she was browsing the RealReal's Website, she had neither the foresight nor the technical expertise to open her browser developer tools to capture what specific data was being intercepted as it was being intercepted.

12.    Plaintiff's communications with Defendant—including the search terms she entered into the Website's search bar, the specific products she viewed, and items she added to her cart, and the items she ultimately purchased—were intercepted in transit by Pinterest and Meta, as enabled by Defendant. This includes, but is not limited to, the specific interactions she had on the Website on February 19, 2026 and November 29, 2025.

13.    Defendant did not obtain Plaintiff's prior consent to this interception on the Website. In fact, Defendant led Plaintiff to believe she could reject or opt out of these interceptions by displaying the cookie pop-up banner that Plaintiff used to reject Defendant's use of cookies and tracking technologies. But instead of respecting Plaintiff's data privacy choices, Defendant still allowed the Third Parties to intercept Plaintiff's communications, in direct contravention of Plaintiff's wishes and instructions to Defendant.

14.    Plaintiff had a reasonable expectation of privacy over her communications with Defendant because she explicitly instructed Defendant not to use tracking cookies and tracking technology while Plaintiff used the Website when she rejected Defendant's use of cookies and tracking technologies via Defendant's cookie pop-up banner on the Website.

---

[2] Review Your Activity Off MetaTechnologies, https://www.facebook.com/help/2207256696182627 (last visited April 2, 2026).

[3] *Id.*

*Defendant*

15.    Defendant, The RealReal, Inc., is a California corporation with its principal place of business in San Francisco, California.

## JURISDICTION AND VENUE

16.    This Court has original subject matter jurisdiction over Plaintiff's ECPA claim under 28 U.S.C. § 1331, and supplemental jurisdiction over her remaining state law claims under 28 U.S.C. § 1367. This Court also independently has subject matter jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed classes are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed classes is a citizen of a state different from Defendant.

17.    The Court has general personal jurisdiction over Defendant because its principal place of business is in California and is thus at home in California.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because as substantial portion of the events giving rise to this action occurred in this District. In particular, Defendant is headquartered in this District, and sent Plaintiff's communications to Meta and Pinterest, both of which are also headquartered in this District.

## FACTUAL ALLEGATIONS

**I.    OVERVIEW OF THE PINTEREST TAG PIXEL**

19.    Defendant has purposefully installed Pinterest's tracking pixel, the Pinterest Tag Pixel, on its Website. Therefore, Defendant has enabled Pinterest to intercept Plaintiff's and Class Members' communications by employing its tracking tools on its Website in the manner described throughout this Complaint.

20.    The Pinterest Tag is a piece of code that "delivers insights to us and our ad partners about actions that a person takes on their website,"—*i.e.* therealreal.com.[4] Advertisers can "use a Pinterest tag on their website, or send us information from their mobile app, to help us understand

---

[4] *Privacy Policy*, PINTEREST, https://policy.pinterest.com/en/privacy-policy (last updated Apr. 30, 2025)

who's visited or made purchases on their site or app. We can use that information to show ads to the right people on Pinterest."[5]

21.    As Pinterest explains, "we customize the ads we show you by identifying your interests based on your … *offsite activities*, as well as by using information we receive f*rom ad partners or other third parties*" like the RealReal.[6] It does this by collecting "information such as cookie IDs, your IP address, or a hashed version of your email address" from various websites.[7] Pinterest thereafter discloses those same identifiers "to third parties, such as Facebook Ads, Google Marketing Platform, and others who may combine that information with other information they already have about you and deliver ads about Pinterest to you."[8]

22.    After a Website like the RealReal implements the Pinterest Tag on its Website, it can review analytics on the data Pinterest collected on its Website through its Pinterest Conversions API. The Pinterest Conversions API allows Pinterest Business customers to access "Pinterest's powerful analytics engine… [which] lets you understand the complete customer journey, from initial inspiration all the way through to checkout."[9] The Pinterest Conversions API allows Pinterest Business customers to "[p]ass web, app and offline data through the API. You can see how your marketing dollars on Pinterest are driving results across channels."[10] In other words, Pinterest Tag users like the RealReal know full well they are sharing detailed customer data with Pinterest.

---

[5] *Personalization and data*, PINTEREST, https://help.pinterest.com/en/article/personalization-and-data (last accessed Feb. 17, 2026).

[6] *Privacy Policy*, PINTEREST, https://policy.pinterest.com/en/privacy-policy (last updated Apr. 30, 2025)

[7] *Id.*

[8] *Id.*

[9] *Cookies crumble. The Pinterest Conversions API sticks.*, PINTEREST, https://business.pinterest.com/blog/cookies-crumble-pinterest-api-for-conversions/ (last accessed Feb. 2026)

[10] *More visibility for smarter campaigns*, PINTEREST, https://business.pinterest.com/capi/ (last accessed Feb. 2026)

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    8

23. For Pinterest Business clients, the benefits of utilizing the Pinterest Conversions API and Pinterest Tag include improved "better tracking and insights into your conversions impact."[11]

24. The Pinterest Tag and Pinterest Conversions API are marketing/advertising solutions that allow Pinterest to identify, survey, and categorize users by combining Pinterest Business clients' data with Pinterest's own data.

## II. OVERVIEW OF THE META PIXEL

25. Defendant has purposefully installed Meta's tracking pixel, the Meta Pixel, on its Website. Therefore, Defendant has enabled Meta to intercept Plaintiff's and Class Members' communications by employing its tracking tools on its Website in the manner described throughout this Complaint.

26. Facebook, owned by Meta, describes itself as a "real identity platform,"[12] meaning users are allowed only one account and must share "the name they go by in everyday life."[13] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[14]

27. Meta sells advertising space by highlighting its ability to target users.[15] Meta can target users so effectively because it surveils user activity both on and off its site.[16] This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests,"

---

[11] *Id.*

[12] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021), https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701?gaa_at=eafs&gaa_n=ASWzDAgBv80qmBk-eG84pjjaXQ_mKin6qQt2xKdYqf7uQnwVhlfB1FJcBH2IlXX7L8Q%3D&gaa_ts=688a0799&gaa_sig=jHy6omcjq_GiHNtDoU8ZxHL8K22doiw4-dodRtswq4rYDH1pK9mDK0B06csW-y2S7xLvXHKhIeRggAdBGESBzQ%3D%3D.

[13] META, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[14] META, SIGN UP, https://www.facebook.com/.

[15] META, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[16] META, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    9

"behavior," and "connections."[17]  Meta compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[18]

28.    Advertisers can also build "Custom Audiences."[19]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[20]  With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[21]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[22]

29.    As Meta puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[23]  Put more succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

[17] META, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[18] META, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[19] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[20] META, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[21] META, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[22] META, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook, Create a Website Custom Audience, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[23] META, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

30.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[24]  Meta's Business Tools can also track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[25]  Advertisers can even create their own tracking parameters by building a "custom event."[26]

31.     A popular Business Tool is the Meta Tracking Pixel (the "Meta Pixel").  Meta offers this piece of code to advertisers, like Defendant, to integrate into its website.  The Meta Pixel "tracks the people and type of actions they take."[27]

32.     An example illustrates how the Meta Pixel works. Take an individual who navigates to Defendant's Website and clicks on a particular clothing item to view. When the individual goes on the webpage to view the particular clothing item, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.

33.     When a user accesses a website hosting the Meta Pixel, Meta's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Meta's servers.  This secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Meta Pixel is configured to collect.  This transmission is initiated by Meta code and concurrent with the communications with the host website. In other words, Meta's interception of users' communications on the Website occurs "in transit."

---

[24] *See* META, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[25] META, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[26] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[27] META, RETARGETING, https://www.facebook.com/business/goals/retargeting.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    11

34.    After collecting and intercepting website users' information, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. In order to engage in the above-described processing, analysis, and assimilation, on information and belief, Meta has to view the information being processed, analyzed, and assimilated. As such, upon information and belief, Meta regularly viewed and used Plaintiff and Class Members' communications that it intercepted via the Meta Pixel.

35.    Each time Defendant sent this activity data, it allowed Meta to intercept user's personally identifiable information, including their Facebook ID ("FID"). A FID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. Notably, while Meta can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Meta admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

36.    A user who accessed Defendant's Website while logged into Facebook transmitted what is known as a "c_user cookie" to Meta, which contained that user's unencrypted Facebook ID.

37.    When integrated and embedded into a website, the Meta Pixel is not akin to a tape recorder or a "tool" used by one party to record the other. Instead, the Meta Pixel involves Meta, a separate and distinct third-party entity from the parties in the conversation, using the Meta Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is so because Meta itself is collecting the content of any conversation. That information is then analyzed by Meta before being provided to any entity that was a party to the conversation (like Defendant).

38.    Once Meta intercepts website communications, it has the capability to use such information for its own independent purposes. In 2021, Meta generated over $117 billion in

revenue.[28]  With respect to the apps offered by Meta, substantially all of Meta's revenue is generated by selling advertising space.[29] Meta sells advertising space by highlighting its ability to target users by including them in the Core Audiences and Custom Audiences offered to its clients.[30]

39.    In practice, this means the information collected is used to (i) analyze trends in consumer behavior based on data collected from websites across the internet that Meta can then use when providing targeted advertising to other companies, (ii) create consumer profiles of specific users, allowing Meta to sell future customers targeted advertising to consumers with specific profile characteristics, and (iii) develop new Meta Business Tools products and services, or improve pre-existing Meta Business Tools products and services.

40.    The Meta Pixel code enables Meta not only to help Defendant with advertising to its own users outside the Website but also includes users among groups targeted by *other* Facebook advertisers relating to interior décor products about which Defendant's users communicated on Defendant's Website.

41.    Meta's Business Help Center explains:

> Meta uses **marketing data to show ads to people who are likely to be interested in them.**  One type of marketing data is website events, which are actions that people take on your website.[31]

42.    In other words, Meta sells advertising space by highlighting its ability to target users.[32]  Meta can target users so effectively because it surveils user activity both on and off its

---

[28] META, META ANNUAL REPORT 2021, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2023/2021-Annual-Report.pdf at 51.

[29] *Id.* at 63.

[30] META, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[31] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added).

[32] META, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    13

site.[33]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and connections.[34]

### III.    THE REALREAL ENABLES THE THIRD PARTIES' INTERCEPTION OF ITS WEBSITE USERS' COMMUNICATIONS

43.    The RealReal has integrated the Third Parties' Tracking Code into its Website. By integrating the Tracking Code into its Website code, Defendant has enabled the Third Parties to intercept Website users' communications with Defendant as users search and browse for products without users' consent. Further, Defendant has enabled the Third Parties to personally identify users, such as Plaintiff, via the c_user cookie, Pinterest cookies, browser fingerprinting, and/or FID, to effectuate targeted advertising related to Plaintiff's and other Website users' actions and communications on the Website.

44.    When a user enters https://therealreal.com, they are able to click on different clothing options which appear on the home page.  *See* Figure 4



*Figure 4*

45.    After clicking on a particular clothing item, for example a "Sea New York" sweater, the user is directed to a page on Defendant's Website where they can choose the size they want and

---

[33] Meta, ABOUT META PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[34] Meta, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.

add the item to their bag. *See* Figure 5. The Meta Pixel automatically detects when a user clicks on the "Sea New York" button. *See* Figure 6.



**Figure 5**



**Figure 6**

46.    Furthermore, due to the integration of the Pinterest Tag Helper Pixel on the Website, Pinterest is also able to intercept the information about the Website page the user reached. This information includes the description of the type of clothing the user is seeking, which is

included in the URL.  For example, if a user selects the "Sea New York" sweater and proceeds to check out, they will be taken to the Website page with the URL: https://www.therealreal.com/products/women/clothing/new-york-lace-pattern-crew-neck-sweater-ttk2x.  *See* Figure 7.  When Pinterest intercepts this communication due to The RealReal's pixel integration of the Pinterest Tag Helper Pixel, Pinterest effectively intercepts the clothing item the consumer clicked on.  *See id.*; Figure 8.



*Figure 7*



***Figure 8***

47.    Likewise, if a user types something into the RealReal website's search bar, that search string collected by the Meta Pixel using its "Search" event. *See* Figure 9, next page. Moreover, because the keywords of the search are reflected in the Website URL, they are also reflected in the Page_View events collected by both Meta and Pinterest. *See* Figures 10-11, next page.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                 17



*Figure 9*



*Figure 10*



*Figure 11*

48.     In addition to this, both Meta and Pinterest connect these actions to specific users.

49.     When Meta intercepts this activity data via the Meta Pixel integrated into the Website by Defendant, it also intercepts a user's Facebook ID ("FID").  A FID is a unique and persistent identifier that Facebook assigns to each user.  With it, any ordinary person can look up the user's Facebook profile and name by adding facebook.com/[FID] into their web browser. For example, the Facebook IDs Meta founders Mark Zuckerberg, Chris Hughes, and Dustin Moskovitz are 4, 5, and 6, respectively. So typing facebook.com/4 into a web browser will lead to Mr. Zuckerberg's Facebook profile, facebook.com/5 will lead to Chris Hughes's profile, and facebook.com/6 will lead to Dustin Moskovitz's profile.  In this way, ordinary people who come into possession of another person's FID can easily use it do identify them and all the personal information that is available on their profiles.

50.     A person's FID is transmitted through the c_user and fr cookies. The c_user cookie's value is the user's unencrypted FID (meaning the number can be copy and pasted from the value to the end of facebook.com/[FID] to lead to someone's facebook profile). The fr cookie's value is also the FID, but this time, it is encrypted so only Meta can decode it. *See* Figures 12, 13. In the example below, 1828550551 is the undersigned's FID which is the value of c_user cookie. The fr cookie, in contrast, contains a string of letters and numbers which has encrypted the same FID value.[35]

51.     When a user is logged into Facebook on the same browser that is used to visit the third-party Website with the Meta Pixel present (or has been logged in at any point in the 90 days and has not deleted their browsing history), both the c_user and fr cookies are sent. Figures 12, 13.

*Figure 12*

---

[35] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

***Figure 13***

52.    If a visitor has never created a Facebook account, neither the c_user nor fr cookies are sent. But the Meta Pixel is nevertheless able to identify the website visitor using yet a third type of the cookie—the _fbp cookie."[36]

53.    The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[37]  Otherwise, the c_user cookie is cleared when the browser exits.[38]

54.    The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[39]  If that happens, the time resets, and another 90 days begins to accrue.[40]

55.    The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[41]  If that happens, the time resets, and another 90 days begins to accrue.[42]

---

[36] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[37] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[38] *Id.*

[39] *See id.*

[40] Confirmable through developer tools.

[41] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[42] Also confirmable through developer tools.

56. The Facebook Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, The RealReal's Website.[43] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[44]

57. Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles. The RealReal sent these identifiers alongside the event data.

58. Defendant also enables Meta to identify individual Website users through advanced matching, by which Meta records the contact details Website users provide on the Website (i.e., email address, phone number, etc.) "With advanced matching, [website operators] can send [Meta] hashed customer information along with [] Meta Pixel events, which can help … match more of the conversions that happen on your website to people on Meta."

59. Defendant also uses "Advanced Matching." With Advanced Matching, Defendant's Meta Pixels "look for recognizable form field and other sources on [the] website that contain information such as first name, last name and email." That information is recorded, "along with the event, or action, that took place."

60. Specifically, as part of Advanced Matching, Defendant enabled "Automatic Advanced Matching." That means Defendant configured the pixel to scan form fields containing a user's email address, first name, last name, phone number, gender, zip code, city and state.

61. For example, in Figure 9, when the user typed "Versace" into the search bar, the Meta Pixel shows that three Advanced Matching Parameters were likewise sent to Meta, including the user's email (denoted as "em") and the user's phone number ("ph"). *See* zoomed in image of Figure 9, reproduced on the next page.

---

[43] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[44] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.



*Figure 9-A*

62.     Like the fr cookie, these Advanced Matching Parameters are encrypted, so on a browser's developer tools (which shows the data transmissions), the user's email and phone number appears as a string of letters and numbers, or as series of hash marks (******@****.***) or number marks (######). *See* Figure 14.



*Figure 14*

IV.    **Facebook and Pinterest Use the Information They Learned About The RealReal Users To Send Those Users Targeted Advertisements.**

63.    As both Facebook and Pinterest note, the point of these technologies matches specific users' interactions online so that future online advertising campaigns will more efficiently retarget those same users. And here it does just that. Within minutes after selecting their clothing products from therealreal.com, and before any purchase is completed, users can begin receiving targeted advertisements for other clothing websites when using other online platforms like Facebook or Instagram, from other personal devices, like their smartphone.

V.    **SEARCH TERMS, PRODUCTS VIEWED, AND ITEMS BEING CHECKED OUT ARE COMMUNICATIONS.**

64.    Users' search terms, products viewed/browsed, and items being checked out on the Website are communications that are a product of users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated).

65.    The names of products users search for, views, and decides to proceed to checkout on the Website are personal information because they "divulge a user's personal interests, queries, and habits." *See In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d at 605 (9th Cir. 2020).

VI.    **DEFENDANT CONTRAVENED PLAINTIFF AND CLASS MEMBERS' EXPLICIT INSTRUCTIONS TO NOT ALLOW TRACKING BY THIRD PARTIES ON THE WEBSITE.**

66.    Defendant allows the Third Parties to intercept Plaintiff and Class Members' confidential communication without obtaining their consent.

67.    Worse yet, Defendant leads consumers to believe that they have the choice to opt out of Defendant's use of tracking cookies and tracking technologies such as the Tracking Code.

68.     This is because when a user first visits the Website, Defendant displays a cookie banner titled "**Your Privacy**." *See* Figure 15.



***Figure 15***

69.     A consumer reading this large, dark, bold "**Your Privacy**" text, with the statement "[w]e respect your privacy" directly under it, may reasonably interpret that to mean they are *not* being tracked, and click "x" to close the banner.  The text disclosing the website's use of cookies

appears in much smaller font, is not bolded, and appears in a fainter grey type that blends into the background. Even assuming a consumer notices this fine print text, the banner still does not give them the option to reject the cookies. Instead, they must click the "Cookie Settings" button and go to another page, and then click the "Reject All" button. *See* Figure 15.

72. But when users explicitly reject Defendant's use of optional targeting technologies, as Plaintiff did, Defendant *still* continues to allow the Third Parties to intercept Website users' communications.

71. Thus, Defendant directly ignores the denial of consent from Website users who reject Defendant's use of tracking technologies and nonetheless enables the Third Parties' interception of users' communications from the Website.

## CLASS ACTION ALLEGATIONS

72. Plaintiff seeks to represent a class of all individuals in the United States who visited the Website and either clicked "x" to close out of the banner or rejected Defendant's use of tracking technologies through the Website's cookie banner, and who conducted searches, viewed specific products, or initiated the checkout process for selected products on the Website and had their communications intercepted by the Third Parties as enabled by Defendant (the "Nationwide Class").

73. Plaintiff seeks to represent a class of all individuals in California who visited the Website and either clicked "x" to close out of the banner or rejected Defendant's use of tracking technologies through the Website's cookie banner, and who conducted searches, viewed specific products, or initiated the checkout process for selected products on the Website and had their communications intercepted by the Third Parties as enabled by Defendant (the "California Class").

74. Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

75. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    25

76. Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; Pinterest and Meta; any affiliate, parent, or subsidiary of Pinterest and Meta; any entity in which Pinterest and Meta has a controlling interest; any officer director, or employee of Pinterest and Meta; any successor or assign of Pinterest and Meta; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

77. **Numerosity.** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of thousands of individuals in the Classes. Class Members can be readily identified from Defendant's records.

78. **Typicality.** Plaintiff's claims are typical of the claims of the Classes because Plaintiff, like all other members, visited Defendant's Website and had her confidential electronic communications intercepted by the Third Parties, as enabled by Defendant.

79. **Adequacy.** Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

80. **Common Questions of Law and Fact Predominate.** Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include, but are not limited to, the following: whether Defendant violated CIPA § 631 and/or § 632 and whether Plaintiff and the proposed Class

Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

81.     **Superiority.** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation Of The California Invasion of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf of the California Class)**

82.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

83.     Plaintiff brings this claim against Defendant individually and on behalf of the California Class.

84.     CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a Plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    27

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

85.     CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

86.     The Third Parties' Tracking Code is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

87.     The Third Parties are "separate legal entit[ies] that offer[] [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes. Accordingly, Pinterest and Meta were a third party to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

88.     At all relevant times, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit.

89.    At all relevant times, the Third Parties used or attempted to use the communications intercepted by the Tracking Code to promote and improve their advertising platforms and/or services.

90.    At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiff and Class Members' communications using the Third Parties' Tracking Code and to accomplish the wrongful conduct at issue here.

91.    Plaintiff and Class Members did not provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct.

92.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violation of CIPA § 631(a), and each seeks statutory damages of $5,000 for Defendant's violations of CIPA § 631(a).

## COUNT II
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 632
### (On Behalf of the California Class)

93.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

94.    Plaintiff brings this claim against Defendant individually and on behalf of the California Class.

95.    CIPA § 632(a) prohibits entities from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

96.    The Third Parties' Tracking Code are "electronic amplifying or recording device[s]."

97.    At all relevant times, the communications between Plaintiff and Class Members on one hand, and Defendant on the other, were confidential.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                29

98.    At all relevant times, Defendant intentionally used the Third Parties' Tracking Code to record such confidential communications without Plaintiff and Class Members' knowledge or consent.

99.    When communicating with Defendant, Plaintiff and Class Members had an objectively reasonable expectation of privacy given that Defendant expressly presented a banner labeled "**Your Privacy**" in bold black letters stating that it "respects your privacy."  Separate and apart from this, Subclass members who clicked "Reject All" button on the cookies banner had an even heightened expectation of privacy given the explicitly denied Defendant permission to use tracking technologies while they used the Website. Thus, Plaintiff and Class Members did not reasonably expect Defendant to record their communications with the Tracking Code (recording devices).

100.    Plaintiff and Class Members did not consent to Defendant's intentional use of an electronic amplifying or record device to record their confidential communications.

101.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for Defendant's violations of CIPA § 632(a).

## COUNT III
### Violation of the Electronic Communications Privacy Act
### 18 U.S.C. § 2511, *et seq.*
### (On Behalf of the Nationwide Class)

102.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

103.    Plaintiff brings this claim on behalf of herself and members of the Nationwide Class.

104.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

105.    The ECPA protects both sending and the receipt of communications.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                           30

106.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

107.    The transmission of Plaintiff's PII to The RealReal's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

108.    The transmission of PII between Plaintiff and Class Members and The RealReal's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

109.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. 18 U.S.C. § 2510(8).

110.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

111.    The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]"  18 U.S.C. § 2510(5).

112.    The following instruments constitute "devices" within the meaning of the ECPA:

a.    The computer codes and programs Defendant used to track Plaintiff and Class Members communications while they were navigating the Website;

b.    Plaintiff's and Class Members' browsers;

c.    Plaintiff's and Class Members' mobile devices;

d.    Defendant's web and ad servers;

e.    The plan the Defendant carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

113.    Plaintiff and Class Members' interactions with The RealReal's Website are electronic communications under the ECPA.

114.    By utilizing and embedding the tracking technology provided by Pinterest and Meta on its website, The RealReal intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

115.    Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the Trackers on the Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII to Meta and Pinterest.

116.    The Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding the clothing items they were interested in or purchased on Defendant's website.  This confidential information is then monetized for targeted advertising purposes, among other things.

117.    The Defendants intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII.  This confidential information is then monetized for targeted advertising purposes, among other things.

118.    By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to Pinterest and Meta through the Trackers while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), The RealReal violated 18 U.S.C. § 2511(1)(c).

119.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

120.    Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of

the Constitution or laws of the United States or of any state, namely, CIPA and invasion of privacy, among others.

121.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, and in further detail below, Defendant's interceptions violated CIPA, the CCPA, the CFAA, and the CDAFA.

122.    Defendant specifically used the Trackers to track and utilize Plaintiff's and Class Members' confidential information for financial gain.

123.    Defendant's conduct violated the California Consumer Privacy Act (CCPA), which provides that "[a] consumer shall have the right, at any time, to direct a business that sells or shares personal information about the consumer to third parties not to sell or share the consumer's personal information. This right may be referred to as the right to opt out of sale or sharing." Cal. Civ. Code § 1798.120(a)(1). The CCPA further provides that the website must give users a "reasonably accessible" form of notice on the "business' internet homepages," that "easily allows a consumer to opt out of the sale or sharing of the consumer's personal information and to limit the use or disclosure of the consumer's sensitive personal information." Civ. Code § 1798.135(a)(1)-(3). As the California Attorney General's office notes, this provision requires companies to give users the choice the opt out of any collection of personal information for cross context behavioral advertising.[45]

124.    Defendant's conduct violated the federal Computer Fraud and Abuse Act (CFAA) which prohibits anyone from "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damages and loss." 18 U.S.C. § 1030(5)(c).

125.    Defendant's conduct violated the California Comprehensive Computer Data Access and Fraud Act when it knowingly and without Plaintiff's or Class Members' authorization inserted cookies on Plaintiff's and Class Members' computing devices.

---

[45] California Consumer Privacy Act, Off. of the Attorney General, State of California, https://oag.ca.gov/privacy/ccpa.

126. The cookies, which constitute programs, commanded Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with The RealReal simultaneously to The RealReal and Third Parties Pinterest, and Meta, as well as others.

127. Defendant knew or had reason to know that the cookies would command Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with The RealReal simultaneously to The RealReal and Third Parties Pinterest, and Meta, as well as others.

128. Defendant knew or had reason to know that its use of cookies would cause Plaintiff and Class Members to suffer a loss, including:

a. The interruption or preclusion of Plaintiff's and Class Members' ability to shop for clothing on Defendant's Website;

b. The loss of privacy due to Defendant making information related to searches for and purchases of specific clothing items on Defendant's website that Plaintiff and Class Members intended to remain private no longer private.

129. Defendant took something of value from Plaintiff and Class Members and derived benefits therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value.

130. Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

131. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy. Plaintiff and Class Members, all of whom are users of the Website, had a reasonable expectation that The RealReal would not redirect their communications to Pinterest and Meta without their knowledge or consent.

132. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

133.    As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2511, *et seq.* under 18 U.S.C. § 2520.

## COUNT IV
**Violation of the Comprehensive Computer Data and Access and Fraud Act**
**Cal. Penal Code § 502, *et seq.***
**(On Behalf of the California Class)**

134.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

135.    Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

136.    The California Comprehensive Computer Data Access and Fraud Act ("CDAFA") was enacted to provide protection from "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems."  Cal. Penal Code § 502(a).

137.    CDAFA affords a private right of action to owners of computers, systems, networks, programs, and who suffer damage or loss as a result of a violation of the Act.  *See* Cal. Penal Code § 502(e)(1).

138.    Relevant here, Cal. Penal Code § 502 imposes civil liability on anyone who:

(c)(2)    Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;

(c)(3)    Knowingly and without permission uses or causes to be used computer services.

(c)(6)    Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section.

(c)(7)    Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

(c)(8)    Knowingly introduces any computer contaminant into any computer, computer system, or computer network.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    35

139.   Under § 502 of the California Penal Code "[f]or purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."  Cal. Penal Code § 502(j).

140.   "Computer services" under the CDAFA "includes, but is not limited to, computer time, data processing, or storage functions, internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network."  Cal. Penal Code § 502(b)(4).

141.   "Computer network" is "any system that provides communications between one or more computer systems and input/output devices, including, but not limited to, display terminals, remote systems, mobile devices, and printers connected by telecommunication facilities."  Cal. Penal Code § 502(b)(2).

142.   "Computer system" is "a device or collection of devices, including support devices…one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control."  Cal. Penal Code § 502(b)(5).

143.   "Data" is defined as "a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions" that "may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device."  Cal. Penal Code § 502(b)(8).

144.   "Computer contaminant" is defined as "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consumer computer resources, modify, destroy, record, or transmit

data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network." Cal. Penal Code § 502(b)(12).

145. Defendant's conduct, described herein, violates Cal. Penal Code §§ 502(c)(2), (3), (6), (7), and (8).

146. Plaintiff and California Subclass members were the owners or lessees of the computers, computer systems, computer networks, and data described herein.

147. The RealReal violated Cal. Penal Code § 502(c)(2) by knowingly accessing and without permission taking, copying, analyzing, and using Plaintiff's and the California Class members' data and sharing it with Pinterest and Meta.

148. In violation of Cal. Penal Code § 502(c)(8), Defendant knowingly introduced and continue to introduce computer contaminants into Plaintiff's and the California Subclass members' computer, computer system, or computer network. Among other things, Defendant introduced the Trackers. The Trackers are designed to, and do, self-propagate to contaminate users' computers, computer systems, and computer networks to record and transmit data that would not otherwise be transmitted or recorded in the normal operation of the computers, computer systems, and computer networks. The Trackers usurp the normal operation of Plaintiff's and California Subclass' computing devices because they supplant Plaintiff's and California Subclass' choices in how those devices and their resources are used.

149. In violation of §§ 502(c)(2)-(3), (6)-(8), Defendant knowingly took, copied, accessed, used, caused to be used, altered, and added Plaintiff's and California Subclass' data, computers, computer services, and computer networks. Among other things, Defendant knowingly introduced its technologies into Plaintiff's and California Subclass' computers, computer systems, and computer networks and provided themselves and other entities the means of accessing Plaintiff's and California Subclass' computers, computer systems, and computer networks in violation of CDAFA by developing the technologies and encouraging and providing the means for the Website and other online services to use and deploy them on their platforms.

150. Third Parties make use of Plaintiff's and California Subclass members' valuable data to obtain money through advertising

---

151. Defendant and Third Parties' use of Plaintiff's and California Subclass members' data is wrongful and unlawful, as described herein

152. Plaintiff and California Subclass members suffered economic injury because The RealReal caused numerous third parties, including Pinterest and Meta, to unjustly profit from Plaintiff's and California Subclass members'online activity.

153. It would not be equitable to allow Defendant to keep those profits, which were generated by their violations of Plaintiff and California Subclass member's privacy interests.

154. As a direct and proximate result of Defendant's unlawful conduct within the meaning of Cal. Penal Code § 502, Defendant has caused losses to Plaintiff and the California Subclass members in an amount to be proven at trial.

155. Plaintiff, on behalf of herself and the California Subclass, seeks compensatory damages and/or disgorgement in an amount to be proven at trial, and declaratory, injunctive, or other equitable relief.

156. Plaintiff and members of the California Subclass are entitled to punitive damages because Defendant's violations were willful, and, upon information and belief, Defendant is guilty of oppression, fraud, or malice within the meaning of Cal. Civil Code § 3294 such that Plaintiff and Class Members are entitled to recovery of exemplary damages under Cal. Penal Code § 502(e)(4).

157. Plaintiff and Class Members are also entitled to recover reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

    (a)    For an order certifying the putative Classes, naming Plaintiff as the representative of the putative Classes, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class Members;

    (b)    For an order declaring that the Defendant's conduct violates the statutes referenced herein;

    (c)    For an order finding in favor of Plaintiff and the putative Classes on all counts asserted herein;

(d)    For statutory damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For injunctive relief as pleaded or as the Court may deem proper; and

(g)    For an order awarding Plaintiff and the putative Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the proposed Classes, demand a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: April 3, 2026                     Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Stefan Bogdanovich*
      Stefan Bogdanovich

Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email: sbogdanovich@bursor.com

*Attorney for Plaintiff*