FAEGRE DRINKER BIDDLE & REATH LLP
Paul A. Rosenthal (SBN 338994)
paul.rosenthal@faegredrinker.com
600 Campus Drive
Florham Park, New Jersey 07932
Telephone: +1 973 549 7000
Facsimile: +1 973 360 9831

Attorneys for Defendant
The RealReal Inc.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KRISTA CURRY, individually and on behalf of all other similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE REALREAL INC.,<br><br>Defendant. | Case No. 3:26-cv-02929<br><br>District Judge: Vince Chhabria<br><br>**DEFENDANT THE REALREAL INC.'S MOTION TO COMPEL ARBITRATION**<br><br>*[Notice of Motion and Motion; Declaration of Amanda Bowman; and [Proposed] Order filed concurrently herewith]*<br><br>Date: July 16, 2026<br>Time: 10:00 a.m.<br>The Hon. Vince Chhabria<br><br>Complaint Filed: April 3, 2026 |

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on July 16, 2026, at 10:00 a.m., or as soon thereafter as this matter may be heard by the Honorable Vince Chhabria in Courtroom 3 – 17th Floor of the above-referenced Court, Defendant The RealReal, Inc. ("TRR"), by and through its counsel of record, will and hereby does move this Court for an Order pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–16, staying this action and compelling Plaintiff Krista Curry to comply with the arbitration agreement in TRR's Terms of Service. TRR seeks this relief on the grounds that Plaintiff and TRR formed a valid arbitration agreement, and Plaintiff's claims fall within the scope of the arbitration agreement.

This motion is based upon this Notice of Motion and Motion, the Declaration of Amanda Bowman and exhibits thereto, as well as all papers and pleadings on file or deemed to be on file herein, and such evidence and argument as may be presented at a hearing.

Dated: May 20, 2026

FAEGRE DRINKER BIDDLE & REATH LLP

By: */s/ Paul A. Rosenthal*
Paul A. Rosenthal

Attorneys for Defendant
THE REALREAL, INC.

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. RELEVANT FACTUAL BACKGROUND ..... 2

A. Plaintiff's Acceptance of TRR's Binding Arbitration Agreement ..... 2

B. Plaintiff Repeatedly Affirmed Her Acceptance of the Arbitration Agreement ..... 4

C. Plaintiff's Interaction with the Cookie Banner also Required Assent to the Terms ..... 6

D. Plaintiff's Allegations Regarding the Capture of Information Regarding Her Account Usage and Purchase on the Website ..... 7

III. ARGUMENT ..... 8

A. Legal Standard for Enforceability of the Arbitration Provision ..... 8

B. The Parties Have a Valid Agreement to Arbitrate Disputes ..... 9

C. Any Dispute Over the Existence, Scope, or Validity of the Arbitration Agreement is Delegated to the Arbitrator ..... 13

D. Plaintiff's Claims are Within the Scope of the Arbitration Agreement ..... 15

E. The Court Should Issue a Stay Pending Resolution of the Arbitration ..... 16

IV. CONCLUSION ..... 17

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) .......... 8

*AT&T Techs Inc. v. CWA.*,
475 U.S. 643 (1986) .......... 15

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... 9

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) .......... 14

*Callaway v. Anheuser-Busch Co., LLC*,
2024 WL 1260806 (C.D. Cal. Mar. 18, 2024) .......... 11

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147 (9th Cir. 2025) .......... 9

*Chaine v. Tesla Energy Ops., Inc.*,
2021 WL 4932733 (C.D. Cal. Apr. 8, 2021) .......... 14

*Charles v. Portfolio Recovery Assocs., LLC*,
2024 WL 1672350 (9th Cir. Apr. 18, 2024) .......... 15

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. Mar. 28, 2000) .......... 9

*Cordas v. Uber Techs., Inc.*,
228 F. Supp. 3d 985 (N.D. Cal. 2017) .......... 10

*Crawford v. Beachbody, LLC*,
2014 WL 6606563 (S.D. Cal. 2014) .......... 10

*Dohrmann v. Intuit*,
823 F. App'x 482 (9th Cir. 2020) .......... 10

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) .......... 8

*In re Facebook Biometric Info. Priv. Litig.*,
185 F. Supp. 3d 1155 (N.D. Cal. 2016) .......... 10

*Ferrari v. Mercedes Benz USA, LLC*,
2018 WL 3399320 (N.D. Cal. Jan. 18, 2018) .......... 15

*Ghazizadeh v. Coursera, Inc.*,
737 F. Supp. 3d 911 (N.D. Cal. 2024) .......... 11

*Graf v. Match.com, LLC*,
2015 WL 4263957 (C.D. Cal. July 10, 2015) .......... 10

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) .......... 14

*James v. Amazon Logistics, Inc.*,
2023 WL 3728694 (N.D. Cal. Jan. 26, 2023) .......... 9

*Lee v. DoNotPay, Inc.*,
683 F. Supp. 3d 1062 (C.D. Cal. 2023) .......... 11

*Lee v. Ticketmaster LLC*,
817 F. App'x 393 (9th Cir. 2020) .......... 9-10

*Maynez v. Walmart, Inc.*,
479 F. Supp. 3d 890 (C.D. Cal. 2020) .......... 12-13

*Mohamed v. Uber Techs. Inc.*,
848 F.3d 1201 (9th Cir. 2016) .......... 14-15

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) .......... 8, 15

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) .......... 9

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) .......... 9

*Patrick v. Running Warehouse, LLC*,
93 F.4th 468 (9th Cir. 2024) .......... 15-16

*Ramirez v. Elec. Arts*,
2021 WL 843184 (N.D. Cal. Mar. 5, 2021) .......... 14

*Republic of Nicaragua v. Standard Fruit Co.*,
937 F.2d 469 (9th Cir. 1991) .......... 9, 12

*In re Ring LLC Privacy Litig.*,
2021 WL 2621197 (C.D. Cal. June 24, 2021) .......... 10

*S.S. by and through Stern v. Peloton Interactive, Inc.*,
566 F. Supp. 3d 1019 (S.D. Cal. 2021) .......... 12

*Simula, Inc. v. Autoliv, Inc.*,
175 F.3d 716 (9th Cir. 1999) .......... 12, 15

*Smith v. Spizzirri*,
601 U.S. 472 (2024) .......... 16

*Swift v. Zynga Game Network, Inc.*,
805 F. Supp. 2d 904 (N.D. Cal. 2011) .......... 13

*Taylor v. Shutterfly, Inc.*,
2018 WL 4334770 (N.D. Cal. Sept. 11, 2018) .......... 15

*Westinghouse Hanford Co. v. Hanford Atomic Metal Trades Council*,
940 F.2d 513 (9th Cir. 1991) .......... 15

*White v. Ring LLC*,
2023 WL 1097554 (C.D. Cal. Jan. 25, 2023) .......... 13-14

**Statutes, Rules & Regulations**

9 U.S.C. § 2 .......... 8

9 U.S.C. § 3 .......... 16

AMERICAN ARBITRATION ASSOCIATION, Consumer Arbitration Rules, Rule 7(a),
https://www.adr.org/media/yawntdvs/2025_consumer_arbitration_rules.pdf
(last visited May 18, 2026) .......... 13

Cal. Penal Code § 631 .......... 7

Cal. Penal Code § 632 .......... 7

Defendant The RealReal Inc. ("TRR"), by and through its undersigned counsel, hereby moves this Court to compel Plaintiff Krista Curry's claims to arbitration and stay this case.

## I. INTRODUCTION

When Plaintiff Krista Curry registered for an account on TRR's website www.therealreal.com (the "Website"), she agreed to arbitrate any disputes she has with TRR related to the Services TRR provided and/or her use of the Website. Every subsequent time that Plaintiff logged into her account, she again consented to the Website's terms of use, including the agreement to arbitrate such disputes. Plaintiff now asserts claims against TRR stemming from alleged misuse of information she submitted to the Website in connection with her use of her TRR account, including search terms, items viewed, and items purchased—claims that fall squarely within the ambit of the parties' contractual agreement to arbitrate. Therefore, this case does not belong in a judicial forum.

The Website provides an online marketplace for individuals to buy and sell luxury designer goods; however, before an individual can participate in the marketplace, they are required to register and log in to an account. It is undisputed that Plaintiff registered for a TRR account through the Website and logged into her account each time she browsed for items on the Website or made a purchase. On each of those occasions, she was required to affirm her consent to the Website's Terms of Service, which include a comprehensive arbitration agreement. Thus, there should be no valid dispute as to contract formation.

Further, any argument regarding the enforceability of the parties' agreement to arbitrate disputes has been delegated to the arbitrator; thus, ending the Court's inquiry and requiring a stay. If the Court nevertheless elects to consider the question of scope, Plaintiff's claims—alleged violations of state and federal law based on information she submitted via the Website in connection with her use of her TRR account—fall within the scope of the broad arbitration agreement.

The parties' contract should be honored, and Plaintiff should be compelled to arbitrate her claims against TRR.

/ / /

/ / /

## II. RELEVANT FACTUAL BACKGROUND

Plaintiff visited the Website and created an account through which she browsed the Website and made at least one purchase. Plaintiff's account creation and subsequent log-ins each required her to agree to be bound by the Website's Terms of Service (the "Terms") which include an agreement to arbitrate disputes. Plaintiff's claims arise from and relate to the alleged capture of information during those uses of the Website.

### A. <u>Plaintiff's Acceptance of TRR's Binding Arbitration Agreement</u>

TRR provides an online marketplace for individuals to buy and sell luxury designer goods. (Declaration of Amanda Bowman, hereafter "Bowman Decl." ¶ 4.) To browse or buy goods on TRR's platform, a person must first agree to the Terms of Service (the "Terms"). (Bowman Decl. ¶ 5.) On September 2, 2019, Plaintiff visited the Website and was presented with the following screen:



(*Id.* ¶ 8.) Plaintiff entered her email address and clicked the "Sign Up" action button. (*Id.* ¶ 9.) Beneath the "Sign Up" action button, the window includes the following language: "By clicking to browse the site you agree to the Terms of Service and Cookie Policy. By logging into The RealReal you are bound by these Terms." (*Id.* ¶ 11.) The phrases "Terms of Service" and "Cookie Policy" are underlined to denote that they are hyperlinks to those respective documents. (*Id.* ¶ 12.) Indeed, if a user clicked on the Terms of Service hyperlink, they would be directed to a browser window with the Website's Terms. (*Id.* ¶ 13.)

On September 2, 2019, when Plaintiff registered for an account and agreed to the Terms, Plaintiff was also agreeing to arbitrate disputes. (*Id.* ¶ 15.) The first paragraph of the Terms contains the following notice in bold typeface and all-capitalized text: "**PLEASE BE ADVISED THAT THIS AGREEMENT CONTAINS AN ARBITRATION PROVISION AND CLASS ACTION WAIVER WHICH LIMIT YOUR RIGHT TO HAVE A DISPUTE HEARD IN COURT. PLEASE READ THIS AGREEMENT AND THE ARBITRATION PROVISION AND CLASS ACTION WAIVER CAREFULLY.**" (*Id.* ¶ 16; Ex. A.)

The section of the Terms titled "**MANDATORY ARBITRATION AGREEMENT AND CLASS ACTION WAIVER**," contains a similar capitalized and bold typeface introduction stating: "**PLEASE READ THIS ARBITRATION PROVISION CAREFULLY TO UNDERSTAND YOUR RIGHTS. BY ELECTING ARBITRATION, YOU AGREE THAT ANY CLAIM THAT YOU MAY HAVE IN THE FUTURE MUST BE RESOLVED THROUGH BINDING ARBITRATION.**" (*Id.* ¶ 17; Ex. A.)

The agreement requires a binding, individual arbitration, administered by the American Arbitration Association (AAA) pursuant to the AAA's Consumer Arbitration Rules. (*Id.* ¶ 18; Ex. A.) Specifically, the Terms state:

> **Any dispute or claim relating in any way to your use of The RealReal Service, the Site, or to any products or services sold or distributed by The RealReal or through TheRealReal.com will be resolved by binding arbitration, rather than in court**, except that you may assert claims in small claims court if your claims qualify.

(*Id.* ¶ 19; Ex. A. (emphasis in original).) The arbitration agreement also dictates that the "Federal Arbitration Act and federal arbitration law apply to this agreement. (*Id.* ¶ 20.)

**B. <u>Plaintiff Repeatedly Affirmed Her Acceptance of the Arbitration Agreement</u>**

Once Plaintiff's account was created, each time she navigated to the Website, she would have been presented with the following pop-up screen:




(*Id.* ¶ 21.) To sign into her account, Plaintiff would have clicked the "Member Sign In" button, located at the bottom of the pop-up window and below the relevant language reaffirming her agreement to be bound by the Terms. (*Id.* ¶ 22.) The disclosure language again confirmed that Plaintiff was bound by the Terms by browsing the Website and "[b]y logging into The RealReal." (*Id.*) During the period from September 2, 2019 to February 27, 2026, TRR's records show that Plaintiff logged into her account on the Website eleven (11) times. (*Id.* ¶ 27, 28.)

Each time that Plaintiff logged into her account, after clicking the "Member Sign In" button, she would have been presented with the following login screen on the Website:




(*Id.* ¶ 24.) Below the "LOG IN" button, this screen states, "By continuing to browse the site you agree to the Terms of Service . . . By logging into The RealReal you are bound by these terms . . . ." (*Id.* ¶ 25.) Each time that Plaintiff logged into her account, she thus agreed to the Terms and the arbitration agreement. (*Id.* ¶ 29.)

On or about May 1, 2023, TRR updated the Terms (the "2023 Terms"). (*Id.* ¶ 30.) The 2023 Terms contain substantially similar provisions to the Terms, including an arbitration provision, invocation of the AAA Consumer Arbitration Rules, class action waiver, and a broad scope that encompasses "all matters, disputes, or claims between You and Us arising from or related to this Agreement or Your relationship with us. . . ." (*Id.* ¶¶ 31–37, Ex. B.) In addition, the 2023 Terms include the following discussion of the scope of the arbitration agreement:

**<u>(a) Scope</u>**

> For all matters, disputes, or claims between You and Us arising from or related to this Agreement or Your relationship with Us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory, including any dispute about the interpretation or application of this dispute resolution provision or the enforceability, revocability or validity of this arbitration provision or any portion of the arbitration provision ("Disputes"), will be resolved by the processes and procedures described in this Section, first amicably and then through final and binding arbitration before a neutral arbitrator instead of in a court by a judge or jury.

(*Id.* ¶ 38, Ex. B.) This provision requires any questions concerning the scope of the arbitration clause, including whether the dispute at issue falls within the ambit of the arbitration agreement, to be determined by the arbitrator. (*Id.*, Ex. B.)

Each time Plaintiff accessed her account on or after May 1, 2023, she would have affirmed her agreement to be bound by the 2023 Terms, including, for example, when Plaintiff completed her purchase through her TRR account on November 29, 2025. (Compl. ¶ 10.) TRR's records show that Plaintiff accessed her account on eight (8) other occasions since May 1, 2023, including on November 11, 2023, January 11, 2025, January 13, 2025, January 14, 2025, May 31, 2025, June 15, 2025, October 21, 2025, and February 27, 2026. (Bowman Decl. ¶ 27.)

### C. <u>Plaintiff's Interaction with the Cookie Banner also Required Assent to the Terms</u>

Once Plaintiff logged into her account, she was presented with the option to accept, reject, or otherwise manage the cookies and technologies collecting information on the Website. (*Id.* ¶ 40; Compl. ¶¶ 3, 4, 68.) Plaintiff includes an image of the cookie banner in her Complaint:




(Compl. ¶ 3.) Above the options to "Accept All" or "Reject All" via button click, the cookie banner provides notice that "[b]y continuing to browse the site you agree to the Terms of Service and the Cookie Policy." (Bowman Decl. ¶ 42; Compl. ¶ 3.) When a user clicks on the underlined Terms of Service, the full text of the Terms is displayed to the user. (Bowman Decl. ¶ 43.)

Plaintiff concedes that she reviewed and interacted with this cookie banner when "she clicked the 'Reject All' button," in addition to reading and relying on the cookie banner. (Compl. ¶¶ 10, 13, 14.) After interacting with the cookie banner, Plaintiff continued to access, interact with, and use the Website. (Compl. ¶ 10.)

### D. Plaintiff's Allegations Regarding the Capture of Information Regarding Her Account Usage and Purchase on the Website

On April 3, 2026, Plaintiff filed her Complaint alleging four causes of action pursuant to the California Invasion of Privacy Act ("CIPA") § 631, CIPA § 632, the Electronic Communications Privacy Act ("ECPA"), and the Comprehensive Computer Data and Access and Fraud Act ("CDAFA") based on the alleged collection of information that occurred following her creation of an account on the Website. (Compl. ¶¶ 82–157.) Plaintiff's claims arise from and relate to her use of the Website. Specifically, Plaintiff alleges that information concerning "search terms, products viewed/browsed, and items being checked out on the Website" (*Id.* ¶ 64), were captured

after she logged into her account, browsed the Website, and ultimately made a purchase. (*Id.* ¶ 12.) Plaintiff further alleges that this information was captured after she elected to "Reject All" cookies through the Website's cookie banner. (Compl. ¶ 10.)

## III. ARGUMENT

Plaintiff's claims against TRR are subject to mandatory arbitration. Plaintiff assented to the Terms when she registered for an account on the Website. Those Terms include a binding arbitration clause that requires this Court to defer any further consideration of jurisdiction to the arbitrator. Plaintiff repeatedly reaffirmed her agreement to arbitration through acceptance of both the Terms and 2023 Terms each time she logged into her TRR account, as well as during her interaction with the cookie banner. Should the Court nevertheless evaluate the scope of the arbitration agreement, it should find that Plaintiff's claims fall within the ambit of the Terms and must be arbitrated. Therefore, TRR respectfully requests that the Court compel Plaintiff's claims to arbitration and stay this action.

### A. <u>Legal Standard for Enforceability of the Arbitration Provision</u>

The Terms' Arbitration Agreement is governed by the FAA, which mandates that binding arbitration agreements in contracts "evidencing a transaction involving [interstate] commerce . . . shall be valid, irrevocable, and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The 'principal purpose' of the FAA is to ensure that private arbitration agreements are enforced according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011).

The FAA reflects a "liberal federal policy favoring arbitration agreements." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018) (citation omitted); *Concepcion*, 563 U.S. at 339. The Supreme Court instructs that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself" or a "defense to arbitrability." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

Here, the Terms expressly incorporate the FAA as governing the dispute between Plaintiff and TRR. The arbitration agreement provides that "[t]he Federal Arbitration Act and federal

arbitration law apply to this agreement." (Bowman Decl. ¶ 20, Ex. A.) However, even if the Terms did not directly reference the FAA, that is not dispositive because the FAA applies where the Terms "evidence[e] interstate commerce." *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991); *see also James v. Amazon Logistics, Inc.*, 2023 WL 3728694, at * 1 (N.D. Cal. Jan. 26, 2023). In *James*, the court confirmed that a contract involving a California citizen and a defendant company that is engaged in the sale of goods throughout the country concerns interstate commerce. 2023 WL 3728694, at *1. Similarly here, the underlying transaction between the parties was an act of interstate commerce where Plaintiff, a citizen of California (Compl. ¶ 9), made an online purchase via the Website and TRR's services are available to consumers nationally. "The court's role under the [FAA] is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. Mar. 28, 2000).

**B. <u>The Parties Have a Valid Agreement to Arbitrate Disputes</u>**

Plaintiff agreed to arbitrate any disputes arising from or related to her use of TRR's Website when she clicked the "Sign Up" button and created an account, forging a valid contract between the parties. The validity of an online agreement is "subject to the same elemental principles of contract formation as paper contracts." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025). "[A]n enforceable agreement may be found where '(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.'" *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) (quoting *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)).

Courts enforce agreements that include arbitration provisions "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). That is true even where the disclosure regarding the terms is below the action button. For example, in *Lee v. Ticketmaster LLC*, the Ninth Circuit confirmed that the plaintiff manifested assent to the applicable terms "each time he clicked the 'Sign In' button when signing into his Ticketmaster account, where

three lines below the button, the website displayed [the disclosure language].” 817 F. App’x 393, 394 (9th Cir. 2020). The Ticketmaster website, like the Website here, required users to “affirmatively acknowledge the agreement before proceeding and the website contained an explicit textual notice that continued use will act as a manifestation of the user’s intent to be bound.” *Id.* at 395.

“[T]he majority of California district courts take the . . . *Lee* approach” and find that so-called “modified clickwrap” agreements “constitute[ ] a binding contract where the user is provided with an opportunity to review the terms of service in the form of a hyperlink immediately above or below a button that must be clicked to affirmatively acknowledge the terms, place an order, or register for an account.” *In re Ring LLC Privacy Litig.*, 2021 WL 2621197, at *5 (C.D. Cal. June 24, 2021); *see also Dohrmann v. Intuit*, 823 F. App’x 482, 484 (9th Cir. 2020) (reversing district court’s denial of motion to compel arbitration because clicking a “Sign In” button directly under disclosure language was sufficient notice to a reasonably prudent internet user of the website’s terms and arbitration clause); *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 990-91 (N.D. Cal. 2017) (finding that user assented to terms when he created an account on the Uber app by clicking “DONE” located above disclaimer: “By creating an Uber account, you agree to the Terms & Conditions and Privacy Policy”); *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1166–67 (N.D. Cal. 2016) (holding that user assented to terms by clicking “Sign Up” box with language immediately below it stating, “By clicking Sign Up, you are indicating that you have read and agree to the Terms of Use and Privacy Policy,” with the terms of use hyperlinked); *Graf v. Match.com, LLC*, 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015) (finding assent to terms where “all users of the Match.com website during the relevant time period were required to affirmatively agree to the Terms of Use when they clicked on a ‘Continue’ or other similar button on the registration page where it was explained that by clicking on that button, the user was affirming that they would be bound by the Terms of Use, which were always hyperlinked and available for review”); *Crawford v. Beachbody, LLC*, 2014 WL 6606563, at *3 (S.D. Cal. 2014) (concluding that user assented to terms by clicking “PLACE ORDER” button appearing immediately below a disclaimer informing user that by clicking the button, user was agreeing to the site's terms).

The court's decision in *Ghazizadeh v. Coursera, Inc.* is particularly instructive because, like here, the assent-manifesting action was creating an account by clicking on a "Sign Up" action button adjacent to the disclosure. 737 F. Supp. 3d 911, 930 (N.D. Cal. 2024). In *Ghazizadeh*, the plaintiff was presented with one action button reading "Sign Up" located above the Terms of Use hyperlink, and the Court held that the proximity to the "Sign Up" button placed the reasonable user on notice that by clicking the button, he was accepting the website's terms. *Id.* The same is true here. "The 'Sign Up' button is directly above the TOU hyperlink—making the 'assent-manifesting action clear' and putting users on notice that continuing [to register for an account] would manifest assent to [TRR's] terms and conditions." *Id.* (citing *Lee v. DoNotPay, Inc.*, 683 F. Supp. 3d 1062, 1075–76 (C.D. Cal. 2023)); (Bowman Decl. ¶¶ 8–13). Similarly, in *Callaway v. Anheuser-Busch Co., LLC*, the plaintiffs were held to have been on actual notice where they conceded a requirement to accept the relevant terms to access the web platform. 2024 WL 1260806, at *5–6 (C.D. Cal. Mar. 18, 2024). The same is true here.

Plaintiff engaged in the "assent-manifesting action" of clicking the "Sign Up" action button when she registered for a TRR account (Bowman Decl. ¶¶ 5, 8, 9, 11.) She also repeatedly reiterated that agreement each time she logged into her account thereafter by following the "Member Log-in" link (located directly below the disclosure language) and then clicking the "Log In" button (located directly above the disclosure language). (Bowman Decl. ¶¶ 21, 22.) Plaintiff's affirmative clicks bound her to the Terms. Thus, there is no valid dispute that Plaintiff formed a valid contract with TRR.

Plaintiff was also provided notice of the Terms through her interaction with the Website's cookie banner. Plaintiff alleges that she interacted with the cookie banner when "she clicked the 'Reject All' button." (Compl. ¶¶ 10, 13, 14.) The cookie banner provides additional notice, above the action buttons, that "[b]y continuing to browse the site you agree to the <u>Terms of Service</u> and the <u>Cookie Policy</u>." (Bowman Decl. ¶¶ 41, 42; Compl. ¶ 3.) After interacting with the cookie banner, Plaintiff continued to access, interact with, and use the Website. (Compl. ¶ 10.) Plaintiff's admissions concerning her review and interaction with the cookie banner stand as a separate, independently sufficient basis for the Court to find that Plaintiff had actual notice of the existence

of the Terms. The notice and affirmative interaction with the cookie banner stand as further, undisputed notice that Plaintiff would be bound by the Website's terms, including being bound to arbitrate her disputes with TRR.

The Terms include a broad agreement to arbitrate disputes. The first paragraph of the Terms contains the following notice in bold typeface and all-capitalized text: "**PLEASE BE ADVISED THAT THIS AGREEMENT CONTAINS AN ARBITRATION PROVISION AND CLASS ACTION WAIVER WHICH LIMIT YOUR RIGHT TO HAVE A DISPUTE HEARD IN COURT. PLEASE READ THIS AGREEMENT AND THE ARBITRATION PROVISION AND CLASS ACTION WAIVER CAREFULLY.**" (Bowman Decl. ¶ 16, Ex. A.) The first paragraph of the 2023 Terms contains a substantially similar disclosure in its first paragraph, alerting a user to the presence of an arbitration agreement in the terms. (*Id.* ¶ 32, Ex. B.)

Both sets of terms require a binding, individual arbitration, administered by the American Arbitration Association (AAA) and pursuant to its Consumer Arbitration Rules. (*Id.* ¶ 18; Ex. A; *Id.* ¶ 34, Ex. B.) Specifically, the agreement in the Terms requires arbitration for "**Any dispute or claim relating in any way to your use of The RealReal Service, the Site, or to any products or services sold or distributed by The RealReal or through TheRealReal.com.**" (*Id.* ¶ 19; Ex. A. (emphasis in original).) The arbitration agreement in the 2023 Terms contains a similarly broad scope requiring arbitration "[f]or all matters, disputes, or claims between You and Us arising from or related to this Agreement or Your relationship with Us." (*Id.* ¶ 34, Ex. B.)

The Ninth Circuit has confirmed that an arbitration clause containing phrases like "any and all disputes" (as used in the Terms) "must be interpreted liberally." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720 (9th Cir. 1999) (citing *Republic of Nicaragua*, 937 F.2d at 474). That Plaintiff may have declined the opportunity to click the hyperlink and review the conspicuously referenced Terms during either the account registration or log in processes does not impact the viability of the agreement. "[I]t is of no consequence whether the consumer actually clicks a hyperlink to read the terms containing the arbitration provision or not." *S.S. by and through Stern v. Peloton Interactive, Inc.*, 566 F. Supp. 3d 1019, 1041 (S.D. Cal. 2021) (granting motion to compel arbitration as to the party that registered for an account through an online sign-up flow); *see also Maynez v. Walmart,*

*Inc.,* 479 F. Supp. 3d 890, 895–96 (C.D. Cal. 2020) (holding that requiring the plaintiff to click on the "Place Order" button adjacent to the disclosure language gave constructive notice, despite the plaintiff's claim she was "never aware" of the arbitration agreement and "never understood" she was agreeing to arbitrate); *Swift v. Zynga Game Network, Inc.,* 805 F. Supp. 2d 904, 908, 912 (N.D. Cal. 2011) (enforcing arbitration agreement despite "no record of whether Plaintiff or anyone else ever clicked on the blue hyperlinked . . . Terms"). Plaintiff was clearly and conspicuously presented with the Terms and, on multiple occasions, affirmatively accepted the Terms by clicking the assent-manifesting action button. Those Terms include an agreement to arbitrate disputes and that agreement should be honored.

### C. <u>Any Dispute Over the Existence, Scope, or Validity of the Arbitration Agreement is Delegated to the Arbitrator</u>

Both the Terms and 2023 Terms delegate to an arbitrator any challenge concerning enforceability or scope of the agreement to arbitrate.

The Terms, which Plaintiff agreed to on three occasions between September 2, 2019 and April 30, 2023 (Bowman Decl. ¶ 27) incorporate by reference the "Consumer Arbitration Rules" which will be administered by the American Arbitration Association (AAA), which grants authority to the Arbitrator as to issue of arbitrability. (*Id.* ¶ 18, Ex. A.) Pursuant to Rule 7(a) of the AAA Consumer Arbitration Rules:

> The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

American Arbitration Association, Consumer Arbitration Rules, Rule 7(a).[1] Thus, the Terms delegate arbitrability to the arbitrator and that is not an issue for the Court to decide.

Courts routinely confirm that an "agreement 'clearly and unmistakably' delegates arbitrability to the arbitrator when it incorporates arbitration rules that give the arbitrator authority to decide arbitrability, like the AAA or JAMS rules." *White v. Ring LLC*, 2023 WL 1097554, at *5 (C.D. Cal. Jan. 25, 2023) (confirming that incorporating arbitration rules delegates questions

---

[1] AMERICAN ARBITRATION ASSOCIATION, Consumer Arbitration Rules, Rule 7(a), https://www.adr.org/media/yawntdvs/2025_consumer_arbitration_rules.pdf (last visited May 18, 2026).

concerning scope to the arbitrator and collecting cases); *see also Brennan v. Opus Bank*, 796 F.3d 1125, 1130–31 (9th Cir. 2015) (holding that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability"); *Ramirez v. Elec. Arts*, 2021 WL 843184, at *4 (N.D. Cal. Mar. 5, 2021) (enforcing delegation clause in AAA Commercial Rules); *Chaine v. Tesla Energy Ops., Inc.*, 2021 WL 4932733, at *4 (C.D. Cal. Apr. 8, 2021) (holding that incorporation of the JAMS Rules constitutes clear and unmistakable evidence that the contracting parties agreed to arbitrate arbitrability). Thus, by incorporating the AAA Consumer Arbitration Rules, the Terms "clearly and unmistakably" delegate arbitrability determinations to the arbitrator.

Separately, the 2023 Terms, which Plaintiff assented to on nine occasions between May 1, 2023 and February 27, 2025 (Bowman Decl. ¶¶ 27–28), delegate questions of "enforceability, revocability or validity" of the arbitration agreement to the arbitrator. (*Id.* ¶ 38.) "[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019). In *Mohamed v. Uber Techs. Inc.*, the Ninth Circuit found that the district court had "erroneously considered whether the arbitration provisions were enforceable when that question was clearly delegated to an arbitrator." 848 F.3d 1201, 1201, 1209 (9th Cir. 2016). The agreements at issue in *Mohamed* "delegated to the arbitrators the authority to decide issues relating to the 'enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision,'' which the court confirmed was broad enough to shift any questions of scope to the arbitrator. *Id.* at 1208–09. "This language . . . clearly and unmistakably indicates the parties' intent for the arbitrators to decide the threshold question of arbitrability." *Id.* at 1209. The same is true here.

The 2023 Terms provide that "any dispute about the interpretation or application of this dispute resolution provision or the enforceability, revocability or validity of this arbitration provision or any portion of the arbitration provision ("Disputes"), will be resolved by the processes and procedures described in this Section." (Bowman Decl. ¶ 38.) That language is broad and provides the arbitrator the authority to decide issues of "enforceability, revocability, or validity" of

the arbitration agreement, just as in *Mohamed*. Where website terms delegate gateway questions of arbitrability to the arbitrator, "this Court may not engage in the limited two-part inquiry to decide the gateway issues of arbitrability." *Taylor v. Shutterfly, Inc.*, 2018 WL 4334770, at *7–8 (N.D. Cal. Sept. 11, 2018). Thus, Plaintiff's claims should be compelled to arbitration, including for any determination of whether Plaintiff's claims fall within the scope of her validly formed agreement to arbitrate.

### D. <u>Plaintiff's Claims are Within the Scope of the Arbitration Agreement</u>

Should the Court opt to consider the question of scope, it should find that Plaintiff's claims fall within the agreement to arbitrate. "[I]t has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate that particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs Inc. v. CWA.,* 475 U.S. 643, 650 (1986). "[A]ny doubts concerning the scope of arbitrable issues must be resolved in favor of arbitration." *Moses H. Cone Hosp.,* 460 U.S. at 24–25. That presumption is particularly applicable where the arbitration clause is broadly worded. *AT&T Techs.,* 475 U.S. at 650; *Westinghouse Hanford Co. v. Hanford Atomic Metal Trades Council*, 940 F.2d 513, 517 (9th Cir. 1991).

"To require arbitration, a party's factual allegations need only 'touch matters' covered by the contract containing the arbitration clause." *Charles v. Portfolio Recovery Assocs., LLC*, 2024 WL 1672350, at *2 (9th Cir. Apr. 18, 2024) (quoting *Simula, Inc*, 175 F.3d at 721). In *Charles*, the Ninth Circuit confirmed that an arbitration clause that covers "any claim, dispute, or controversy" that "arises from or relates to" a party, service, or site was sufficiently broad to encompass the disputes at issue and thus affirmed granting the defendant's motion to compel arbitration. *Id.*; *see also Ferrari v. Mercedes Benz USA, LLC*, 2018 WL 3399320, at *1–2 (N.D. Cal. Jan. 18, 2018) (granting motion to compel arbitration where the language of the arbitration provision was similarly broad and "relate[d] to" the dispute at issue). Similarly, in *Patrick v. Running Warehouse, LLC*, the Ninth Circuit affirmed an order compelling arbitration of website data-breach claims under online terms covering "any and all claims" and disputes arising from or relating in any way to the

plaintiff's use or purchase of products or services through the website. 93 F.4th 468, 475, 481–82 (9th Cir. 2024).

Here, the Terms are worded such that the plain reading encompasses Plaintiff's allegations concerning the collection of information through her use of the Website. The Terms, in pertinent part, state that:

> Any dispute or claim relating in any way to your use of The RealReal Service, the Site, or to any products or services sold or distributed by The RealReal or through TheRealReal.com will be resolved by binding arbitration . . . .

(Bowman Decl. ¶ 19, Ex. A.) The 2023 Terms provide for a similarly broad scope, requiring a party arbitrate "all matters, disputes, or claims between You and Us arising from or related to this Agreement or Your relationship with Us." (*Id.* ¶ 34, Ex. B.) Plaintiff concedes that her dispute arises from her "relationship with [TRR]" and "use of The RealReal . . . Site" (Ex. B) because she was required to register for, and log into, her account before she could input the information allegedly captured by the Website, including "the search terms she entered into the Website's search bar, the specific products she viewed, and items she added to her cart, and the items she ultimately purchased." (Compl. ¶ 12.) Plaintiff's allegations are thus encompassed by the expansive language of the arbitration agreement and the matter should be compelled to arbitration.

### E. <u>The Court Should Issue a Stay Pending Resolution of the Arbitration</u>

Section 3 of FAA directs courts to stay litigation that is subject to an arbitration clause between the parties. Section 3 states, in relevant part:

> If any suit or proceeding be brought . . . upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

9 U.S.C. § 3. "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). Thus, TRR respectfully requests that this Court stay all proceedings during the pendency of the arbitration.

## IV. CONCLUSION

The RealReal Inc. respectfully requests that the Court compel Plaintiff to arbitrate her claims and stay this action pending the outcome of that proceeding.

Dated: May 20, 2026

FAEGRE DRINKER BIDDLE & REATH LLP

By: */s/ Paul A. Rosenthal*
Paul A. Rosenthal

Attorneys for Defendant
The RealReal Inc.